UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| FG SRC LLC,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>Peakspeed, Inc. and David Eaton,<br><br>　　　　　　　Defendant. | Civil File No. _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff FG SRC LLC ("FG SRC") hereby files this Complaint and Demand for Jury Trial against Defendants Peakspeed, Inc. ("Peakspeed") and David Eaton ("Eaton"). Plaintiff alleges as follows:

## I. Parties

1. FG SRC LLC is a Delaware limited liability company that is headquartered in Dallas, Texas. None of its members are citizens of Minnesota.

2. Peakspeed, Inc. is a Delaware corporation that is headquartered in Deephaven, Minnesota at the private residence of David Eaton. Peakspeed may be served through its registered agent The Corporation Trust Company, Corporation Trust Center 1209 Orange St., Wilmington, DE 19801.

3. David Eaton is a resident of Deephaven, Minnesota.

## II. Jurisdiction and Venue

4. The Court has original and exclusive subject matter jurisdiction over these claims under 28 U.S.C. §§ 1331, 1332, and 1836(c) because:

1

      (a) Plaintiff is a citizen of a different state than all Defendants and the amount in controversy exceeds $75,000.

      (b) Plaintiff is asserting trade secret misappropriation claims under 28 U.S.C. § 1836, which confers the Court with original jurisdiction for all civil actions brought under that section.

5. Venue is appropriate under 28 U.S.C. § 1391(b) and (c) because all Defendants reside in this judicial district and are subject to the Court's personal jurisdiction.

### III. Factual Allegations

**A. FG SRC is the successor of DirectStream, LLC.**

6. On January 20, 2020, FG SRC entered into a Strict Foreclosure in Partial Satisfaction of Obligations ("Foreclosure") with DirectStream, LLC ("DirectStream").

7. The Foreclosure transferred DirectStream's property (both tangible and intangible), contract rights, and the right to sue to FG SRC.

**B. DirectStream develops an FPGA-based orthorectification application during David Eaton's employment.**

8. DirectStream and its predecessor company, SRC Computers, LLC, pioneered the use of Field Programmable Gate Arrays (FPGAs) as general-purpose processors to create small, energy efficient, supercomputers.

9. These new supercomputers outperform conventional computers by a factor of 100x (or more) while using less power.

10. These innovations were the result of private research and development done by SRC Computers, which was founded in 1996 by Jim Guzy, Jon Huppenthal, and Seymour Rodger Cray (hence SRC), who is widely considered to be the father of supercomputing.

11. Notably, SRC Computers' first customers were the National Security Agency ("NSA"), the Naval Postgraduate School, and George Washington University.

12. SRC Computers and DirectStream spent over $150 million in research and development for its patented reconfigurable supercomputers.

13. For over a decade, SRC Computers' proven systems have been used for some of the most demanding military and intelligence applications, including the simultaneous real-time processing and analysis of radar, flight and mission data collected from a variety of aerial vehicles in over 1,000 successful counterterrorism and counter-insurgency missions for the U.S. Department of Defense.

14. On April 1, 2016, David Eaton was hired as a director at DirectStream.

15. In consideration for his "employment or continuing employment," Eaton entered into an Employment Agreement with DirectStream. **Exhibit A**.

16. The Employment Agreement contains the following Non-Solicitation and Non-Disclosure clauses:

> 2. **Non-Solicitation.** I agree that for a period of eighteen (18) months after my employment ends with DirectStream, I will not, directly or indirectly, solicit, contact, communicate with, or attempt to communicate with any individual or company that was a customer or a bona fide prospective customer of DirectStream prior to my termination of employment, AND with whom I worked with for the purpose of offering or providing services or products that may compete with the services or products offered by DirectStream.
>
> 3. **Non-Disclosure of DirectStream Information.** Both during and after my employment with DirectStream, I will not use or disclose to any individual or company any confidential information of DirectStream, including any business methods, procedures, pricing and marketing structure and strategy, programs, sales methods, distribution methods, communication strategies, information about current, former or prospective customers, trade secret information, product formulas, manufacturing processes, or other data and information relating to DirectStream, which I learned during my employment with DirectStream.

17. In addition, the Employment Agreement also contains a Patent, Copyrights and Other Developments clause that states that DirectStream "shall own and have exclusive rights to anything related to its actual or prospective business, which I conceive or work on while employed by DirectStream."

18. During his time at DirectStream, Eaton was an advisor to the CEO and other management team members on technology and product decisions, including how to sell and market DirectStream's products.

19. Because part of his job was to sell DirectStream's products, Eaton had access to DirectStream's confidential customer lists, pricing information, sales history, historical purchasing information, and customer needs and preferences.

20. One of the primary products that DirectStream was developing during Eaton's employment was an orthorectification application that would run on Field Programmable Gate Arrays ("FPGA").

4

21. This orthorectification application was a primary focus of DirectStream from 2018 through 2020.

22. Orthorectification is used to correct distortions contained in all aerial photographs that are the result of the tilt of the camera, the shape of the earth, topography.

23. All images captured by a satellite or drone must be orthorectified for those images to be accurate and actionable.

24. Because of the proliferation of satellites and drones, the demand for orthorectification and related image processing software is extraordinary—an estimated $10-$15 billion market for software alone.

25. The majority of satellite and drone imagery is used by intelligence and defense industries where time is of the essence and the difference between a few minutes or even seconds could potentially be the difference between life and death.

26. Orthorectification is a computationally intensive process because of the numerous mathematical calculations required.

27. As a result, orthorectification on an FPGA can be done multiple times faster than on a traditional CPU.

28. But developing applications for FPGAs is difficult and time consuming because FPGA programming languages are difficult to master.

29. So very few companies have programmers that understand how to develop applications for FPGAs.

30. Timothy Emerson ("Emerson") was the principal solutions architect of the orthorectification program at DirectStream.

31. Oscar Kramer ("Kramer") was a DirectStream contractor who worked with Emerson on DirectStream's orthorectification application.

32. Kramer and Emerson worked together to create DirectStream's orthorectification program that could run on FPGAs.

33. Both Emerson and Kramer wrote and had access to the source code for DirectStream's orthorectification program.

34. DirectStream treated its orthorectification source code, program architecture, and other documentation related to its orthorectification application as a trade secret.

35. DirectStream spent hundreds of thousands of dollars and thousands of man-hours developing its orthorectification application.

36. DirectStream took reasonable measures to protect its trade secrets by requiring all employees and contractors to sign non-disclosure agreements, using password protection for its computer systems, limiting access to its facilities, and only allowing access to its trade secrets on an as needed basis (*i.e.*, limiting access to those who needed the information to fulfill their job responsibilities).

37. Mr. Emerson's employment with DirectStream ended in April of 2019.

38. Kramer's work as a contractor for DirectStream ended in late 2019.

39. Eaton's employment at DirectStream ended in January of 2020.

**C. During his employment at DirectStream, David Eaton secretly starts a competing company called Peakspeed to commercialize DirectStream's trade secrets.**

40. Sometime in 2019, David Eaton decided to start a new company called Peakspeed to sell an FPGA based orthorectification application identical to DirectStream.

41. While he continued to work at DirectStream, David Eaton began contacting some of DirectStream's customers to see if they would be interested in Peakspeed's orthorectification application.

42. These customers included Boon Logic, Lockheed Martin, Rincon Research, and Pixia.

43. Eaton attended the SC19 conference for EmersonAI, but he listed his employer as "Parallel Computing Solutions" on his badge to hide his affiliation with EmersonAI.

44. Eaton's solicitation of these customers on behalf of Peakspeed breached his Employment Agreement with DirectStream.

45. Eaton incorporated Peakspeed as a Delaware corporation at the end of January 2020 and hired Emerson to serve as its Chief Technical Officer.

46. In 2019, before he left DirectStream, Eaton and Emerson developed ideas for two products—an orthorectification product named TrueView, and an artificial intelligence product named IdentifAI.

47. The name of Peakspeed's orthorectification application was changed from TrueView to Peakspeed Ortho sometime in late 2020 because of a co-pending lawsuit Peakspeed filed against Emerson July 2020 concerning the ownership of the source code for the orthorectification application. *See Peakspeed, Inc. v. Timothy Emerson*, Civil No. 20-1630 (JRT/BRT) (filed on July 24, 2020).

48. The name of Peakspeed's IdentifAI application was changed to Peakspeed AI-Classify in late 2020 for the same reason.

49. Eaton began recruiting Oscar Kramer to join his new venture in October 2019, while they were both still working for DirectStream.

50. In January and February 2020, Eaton hired Dave Zimmerman and Oscar Kramer to develop the software, author the code, and serve as the architects for these two products.

51. Critically, Eaton hired Emerson and Kramer because of their orthorectification work at DirectStream and he expected them to bring that work and code with them to Peakspeed.

52. Specifically, Kramer brought a copy of DirectStream's orthorectification source code that he had surreptitiously copied into a private branch of OSSIM that was only accessible to him.

53. Eaton knew that Kramer had a copy of DirectStream's orthorectification source code and specifically encouraged Kramer to bring it with him to Peakspeed.

54. Kramer then used DirectStream's source code when he co-created Peakspeed's orthorectification application with Emerson.

55. In November 2020, Peakspeed launched its Peakspeed Ortho application in the Xilinx App Store.

### IV. Causes of Action

**A. First Cause of Action: Breach of Contract against David Eaton.**

56. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

57. David Eaton has breached the Non-Solicitation and Non-Disclosure provisions of his Employment Agreement with DirectStream by contacting multiple customers and prospective customers of DirectStream, including at least Boon Logic and Lockheed Martin.

58. On April 1, 2016, David Eaton was hired as a director at DirectStream.

59. In consideration for his "employment or continuing employment," Eaton entered into an Employment Agreement with DirectStream.

60. DirectStream fully performed under the Employment Agreement by employing Eaton until January 2020.

61. Eaton has breached the Employment Agreement's Non-Disclosure clause by utilizing DirectStream's confidential orthorectification source code that was brought to Peakspeed by Kramer.

62. Eaton has also breached the Employment Agreement's Patents, and Copyright and other Development clause by failing to disclose and assign to DirectStream all work

relating to TrueView and IdentifAI that he was secretly involved with during his employment at DirectStream.

63. FG SRC, as DirectStream's successor, has suffered and will suffer actual losses in an amount to be determined at trial.

64. In addition, FG SRC has also suffered irreparable harm because of Eaton's ongoing breaches.

**B. Second Cause of Action: Trade Secret Misappropriation Under Defend Trade Secrets Act Against all Defendants.**

65. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

66. Plaintiff brings this claim for Trade Secret Misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836 against all Defendants.

67. DirectStream treated its orthorectification source code, program architecture, and other documentation related to its orthorectification application as a trade secret.

68. DirectStream spent hundreds of thousands of dollars and thousands of man-hours developing its orthorectification application.

69. DirectStream's orthorectification application was valuable because it was proprietary.

70. It would take years and hundreds of thousands of dollars to replicate DirectStream's orthorectification application.

71. DirectStream took reasonable measures to protect its trade secrets by requiring all employees and contractors to sign non-disclosure agreements, using password

protection for its computer systems, limiting access to its facilities, and only allowing access to its trade secrets on an as needed basis (*i.e.*, limiting access to those who needed the information to fulfill their job responsibilities).

72. Nevertheless, while he was employed at DirectStream, Eaton recruited Oscar Kramer to join his new venture, Peakspeed, knowing that Kramer had an unauthorized copy of DirectStream's orthorectification source code in his possession.

73. Eaton knew that DirectStream's source code was a trade secret but encouraged and expected Kramer to utilize the misappropriated source code to help Peakspeed to develop its Peakspeed Ortho application.

74. And this enabled Peakspeed to quickly develop its Peakspeed Ortho application.

75. These actions were undertaken willfully, or in reckless disregard for DirectStream/FG SRC's rights because Eaton knew that Kramer was not authorized to retain a copy of DirectStream's orthorectification source code or to provide it to Peakspeed to create a competing product.

76. As a direct result of Defendants' actions, FG SRC has suffered and will suffer actual losses in an amount to be determined at trial.

77. As a direct result of Defendants' actions, FG SRC has suffered irreparable harm.

78. Under 18 U.S.C. § 1836(b)(3)(C), FG SRC is entitled to exemplary damages for Defendants' willful and malicious misappropriation of its trade secrets.

79. Under 18 U.S.C. § 1836(b)(3)(d), FG SRC is entitled to recovery of its attorney's fees because of Defendants' willful and malicious misappropriation of its trade secrets.

**C. Third Cause of Action: Trade Secret Misappropriation Under Minnesota's Uniform Trade Secrets Act Against all Defendants.**

80. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

81. Plaintiff brings this claim for Trade Secret Misappropriation under Minnesota's Uniform Trade Secrets Act, Minn. Stat. § 325C against all Defendants.

82. DirectStream treated its orthorectification source code, program architecture, and other documentation related to its orthorectification application as a trade secret.

83. DirectStream spent hundreds of thousands of dollars and thousands of man-hours developing its orthorectification application.

84. DirectStream's orthorectification application was valuable because it was proprietary.

85. It would take years and hundreds of thousands of dollars to replicate DirectStream's orthorectification application.

86. DirectStream took reasonable measures to protect its trade secrets by requiring all employees and contractors to sign non-disclosure agreements, using password protection for its computer systems, limiting access to its facilities, and only allowing access to its trade secrets on an as needed basis (*i.e.*, limiting access to those who needed the information to fulfill their job responsibilities).

87. Nevertheless, while he was employed at DirectStream, Eaton recruited Oscar Kramer to join his new venture, Peakspeed, knowing that Kramer had an unauthorized copy of DirectStream's orthorectification source code in his possession.

88. Eaton knew that DirectStream's source code was a trade secret but encouraged and expected Kramer to utilize the misappropriated source code to help Peakspeed to develop its Peakspeed Ortho application.

89. And this enabled Peakspeed to quickly develop its Peakspeed Ortho application.

90. These actions were undertaken willfully, or in reckless disregard for DirectStream/FG SRC's rights because Eaton knew that Kramer was not authorized to retain a copy of DirectStream's orthorectification source code or to provide it to Peakspeed to create a competing product.

91. As a direct result of Defendants' actions, FG SRC has suffered and will suffer actual losses in an amount to be determined at trial.

92. As a direct result of Defendants' actions, FG SRC has suffered irreparable harm.

93. Under Minn. Stat. § 325C.03, FG SRC is entitled to exemplary damages for Defendants' willful and malicious misappropriation of its trade secrets.

94. Under Minn. Stat. § 325C.04, FG SRC is entitled to recovery of its attorney's fees because of Defendants' willful and malicious misappropriation of its trade secrets.

## V.   Demand for Jury Trial

95. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

## VI. Relief

WHEREFORE, FG SRC seeks the following relief:

(a) Judgment be entered in its favor and against Defendants for all claims;

(b) An award of damages in an amount to be proven as to each claim;

(c) Exemplary damages for Claims II and III;

(d) Preliminary and Permanent Injunctive Relief;

(e) An award of costs, expenses, and attorneys' fees associated with this case.

(f) Pre- and Post-Judgement interest;

(g) Any other relief the Court deems just and proper.

LARKIN HOFFMAN

Dated: March 2, 2021   By */s/ R. Henry Pfutzenreuter*
R. Henry Pfutzenreuter (#391468)
8300 Norman Center Drive, Suite 1000
Minneapolis, Minnesota 55437-1060
Telephone: 952-896-3325
hpfutzenreuter@larkinhoffman.com

Attorney for Plaintiff FG SRC LLC